1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   CALIFORNIA BOARD SPORTS, INC.,                **CASE NO. 06CV2365  IEG (AJB)**

12                                    Plaintiff,    **ORDER DENYING PLAINTIFF'S**
                        vs.                         **MOTION FOR SUMMARY**
13                                                  **JUDGMENT**

14   VANS, INC.,                                    [Doc Nos. 43, 44, 45, 46, 47, 48, 49,
                                                    51, 52, 53, 54, 55, 56, 58]
15                                    Defendant.

16          Presently before the Court is Plaintiff California Board Sports, Inc.'s ("CBSI's") motion

17   for summary judgment.  For the reasons set forth below, the Court DENIES Plaintiff's motion.

18                            <u>**BACKGROUND**</u>

19   **A.      Factual Background**

20          This civil action is for trademark infringement and unfair competition arising under the

21   Lanham Act, 15 U.S.C. § § 1114 and 1125(a).

22          Plaintiff CBSI markets a brand of casual shoes, accessories, and apparel under the mark

23   "Osiris" and "Osiris design."  Plaintiff uses several different designs and patterns on its shoes

24   including various generic black and white checkerboard patterns.

25          Defendant Vans, Inc. ("Vans") is one of CBSI's main competitors in the field of casual shoes,

26   accessories, and apparel marketed to the skate and surf community.  Defendant owns a trademark

27   registration for a slip-on shoe with a generic black and white checkerboard pattern over the entire

28   front, tongue and heel of the shoe, which Defendant refers to as the "Classic Slip-On."  The picture

1   registration for the Classic Slip-On, a.k.a., Defendant' Registration No. 1,583,727 ("Slip-On
2   Registration") is set forth below:



7   Notably, Defendant uses a checkerboard pattern on approximately 5.8% of its entire shoe line and
8   sales of shoes featuring the checkerboard pattern account for approximately 14% of Defendant's
9   footwear business.  (Def. Opp'n, Bettencourt Decl., ¶ 8.)

10  **B.      Procedural Background**

11          Plaintiff filed the instant lawsuit, alleging Defendant's registration for its Classic Slip-On deck
12  shoe does not confer rights to the generic pattern of a black and white checkerboard nor does it
13  preclude third parties, like Plaintiff, from using decorative checkerboards on shoes for design,
14  descriptive, or non-source identifying purposes.  (Doc. No. 1.)  Plaintiff utilizes the checkerboard
15  pattern on its "Serve Black" shoe, which is pictured alongside the Classic Slip On below:



23          **CLASSIC SLIP ON                    CBSI SERVE BLACK**

24  Plaintiff's complaint asked for (1) a declaration of non-infringement of trademark; and (2) a
25  declaration of non-dilution of trademark.  (Id.)

26          Defendant answered, arguing that as holder of the Slip-On Registration, it has exclusive right
27  to use the checkerboard pattern nationwide in connection with its respective goods.  Accordingly,
28  Defendant asserted counterclaims against Plaintiff for (1) trademark infringement; (2) unfair

competition; and (3) misappropriation under California law based on Plaintiff's use of the checkerboard pattern on the Serve Black shoe.  (Doc. No. 3.)

On September 14, 2007, Plaintiff filed a motion for summary judgment based on four independent grounds: (1) Defendant has no trademark rights in the checkerboard pattern because the checkerboard pattern is generic or merely decorative; (2) Defendant has no trademark rights in the checkerboard pattern because the pattern is functional; (3) even assuming Defendant has trademark rights in the checkerboard pattern, Plaintiff's use of the checkerboard pattern creates no likelihood of confusion; or (4) even assuming Defendant has trademark rights in the checkerboard pattern, Plaintiff's use of the checkerboard pattern is fair use. (No. 43.)  The Court held argument on October 22, 2007.

## LEGAL STANDARD

Summary judgment is proper where the pleadings and materials demonstrate that "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A material issue of fact is a question that a trier of fact must answer to determine the rights of the parties under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  Summary judgment may be granted in favor of a moving party on an ultimate issue of fact where the moving party carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; see Nissan Fire & Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000).

The moving party bears "the initial responsibility of informing the district court of the basis for its motion." Celotex, 477 U.S. at 323.  To satisfy this burden, the moving party must demonstrate that no genuine issue of material fact exists for trial. Id. at 322.  However, the moving party is not required to negate those portions of the non-moving party's claim on which the non-moving party bears the burden of proof. Id. at 323.  To withstand a motion for summary judgment, the non-movant must then show that there are genuine factual issues which can only be resolved by the trier of fact. Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir.2000) (citing Fed. R. Civ. P. 56;

1    <u>Celotex</u>, 477 U.S. at 323).  The nonmoving party may not rely on the pleadings but must present

2    specific facts creating a genuine issue of material fact.  <u>Nissan</u>, 210 F.3d at 1103.  The inferences to

3    be drawn from the facts must be viewed in a light most favorable to the party opposing the motion,

4    but conclusory allegations as to ultimate facts are not adequate to defeat summary judgment.  <u>Gibson</u>

5    <u>v. County of Washoe, Nev.</u>, 290 F.3d 1175, 1180 (9th Cir. 2002). The court is not required "to scour

6    the record in search of a genuine issue of triable fact,"  <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th

7    Cir.1996), but rather "may limit its review to the documents submitted for purposes of summary

8    judgment and those parts of the record specifically referenced therein." <u>Carmen v. San Francisco</u>

9    <u>Unified Sch. Dist.</u>, 237 F.3d 1026, 1030 (9th Cir. 2001).

10                                                    **DISCUSSION**

11           A trademark is "any word, name, symbol, or device or any combination thereof" used by a

12   person "to identify and distinguish his or her goods . . . from those manufactured or sold by others and

13   to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

14           To state an infringement claim under § 43(a) of the Lanham Act, a plaintiff must meet three

15   basic elements: (1) distinctiveness, (2) non-functionality, and (3) likelihood of confusion.  <u>Kendall-</u>

16   <u>Jackson Winery, Ltd., v. E. & J. Gallo Winery</u>, 150 F.3d 1042, 1047 (9th Cir. 1998).  As noted above,

17   Plaintiff asserts that Defendant cannot raise a triable issue as to any of these requirements.  In the

18   alternative, Plaintiff argues that even if Defendant has trademark rights in the checkerboard pattern,

19   Plaintiff is entitled to summary judgment because (4) Plaintiff's use is protected by the fair use

20   doctrine.

21           As an initial matter, the Court **OVERRULES** Defendant's Objections to Plaintiff's

22   Declarations. (Doc. No. 45, 46, 47, 48.)  The Court similarly **OVERRULES** Plaintiff's Objection to

23   Defendant's declaration. (Doc. No. 52.)

24   A.       **Distinctiveness**

25           The distinctiveness element comes from § 2 of the Lanham Act, which sets forth the

26   requirements for registering a trademark.  To be protected under § 2, a mark must be capable of

27   distinguishing the applicant's goods from the goods of others.  In other words, the mark must be

28   distinctive.

06cv2365

1    Trademarks are often classified in one of five categories of increasing distinctiveness: (1)
2  generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.  The latter three categories of
3  marks, because their intrinsic nature serves to identify a particular source of a product, meet the
4  distinctiveness element automatically.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768
5  (1992).  At the other end of the spectrum are generic marks.  Generic marks constitute a common
6  descriptive name which "refers to the genus of which the particular product is a species." Id. (internal
7  citation and quotations omitted).  An example would be the term "shoe" being used to identify a firm
8  as the source of particular shoes.  Generic marks can never meet the distinctiveness element and thus
9  are not registrable as trademarks.  Occupying a middle ground are descriptive marks.  Descriptive
10  marks define qualities or characteristics of a product.  An example would be "Vision Center" to
11  reference a business offering optical goods and services.  Because descriptive marks do not inherently
12  identify a particular source, they cannot automatically meet the distinctiveness element.  However,
13  a descriptive mark may acquire distinctiveness if the public comes to associate the mark with a
14  specific source.  Such acquired distinctiveness, which is referred to as "secondary meaning," allows
15  § 43 to protect descriptive marks that otherwise could not qualify for protection as trademarks.  Id.
16  at 769.    As an initial matter, the parties dispute the proper category of the checkerboard pattern.
17

18    Plaintiff says that the pervasive use of the checkerboard pattern on footwear and apparel makes
19  it generic, and thus incapable of serving to identify Defendant or any other party as the source of
20  products bearing the design.  In support, Plaintiff cites the Ninth Circuit's decision in Kendall-Jackson
21  Winery in which the court held that because wine bottles had long used grape leaves to decorate their
22  labels, the emblem had become generic for wine and was therefore not protectable as a trademark.
23  150 F.3d at 1049.  The court explained that the grape leaf had lost the power to differentiate wine
24  brands since precisely the same reasoning linked its use on different manufacturer's labels: "A grape
25  leaf suggests a grapevine, which suggests a grape, which suggests wine." Id.  So too, argues Plaintiff,
26  the numerous examples of footwear and clothing adorned with checkerboard patterns renders it
27  generic, and thus incapable of creating a separate commercial impression in the buyer's mind for
28  Defendant.  In a related argument, Plaintiff claims that Defendant's use of the checkerboard pattern

1    on its entire shoe compels a finding that the checkerboard is simply a decoration and not a source

2    identifier.

3           Defendant disagrees with the generic categorization for the checkerboard pattern, arguing that

4    the pattern falls within the class of designs eligible to serve a source identifying function.  Defendant

5    contends that a triable issue of fact exists as to whether the checkerboard pattern, which it concedes

6    is a commonly used design, has indeed acquired such secondary meaning based on Defendant's 25

7    year history of using the checkerboard design in connection with its shoes and its over $100 million

8    dollar investment in promoting and advertising its shoes.  (Def. Opp'n, Bettencourt Decl., at 4.)

9    Defendant relies on cases in which courts have extended protection to commonly-used symbols and

10   designs.  See e.g., K-Swiss, Inc. v. USA AISIQI Shoes, Inc., 291 F.Supp.2d 1116, 1121022 (C.D. Cal.

11   2003) (finding that K-Swiss' trademarked design of five equidistant stripes valid); In re Swift & Co.,

12   223 F.2d 950 (C.C.P.A. 1955) (red and white polka dot band could constitute valid trademark).

13           **i.     Analysis**

14          The Court rejects Plaintiff's claim that the checkerboard pattern is generic or merely

15   decorative.  The prohibition on the trademarking of generic names is a recognition that the name of

16   a product or service cannot also act as a source identifier.  As Professor McCarthy explains, "the name

17   of a product or service itself—what it is—is the very antithesis of a mark."  J. McCarthy, McCarthy

18   on Trademarks and Unfair Competition, § 7:24 (4th ed. 2007) (hereinafter, "McCarthy").  Unlike the

19   grape leaf in Kendall-Jackson which the court concluded was "generic"since it answered the question

20   "What are you?" when placed on a bottle containing liquid (the answer being wine), Plaintiff has

21   failed to establish that the checkerboard pattern serves the same "What are you?" function in

22   connection with shoes.  The Court finds that a black and white checkerboard, while lacking

23   independent distinctiveness, falls into the class of designs eligible to acquire secondary meaning as

24   a source-identifier.  Cf. Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159 (1995) (holding that

25   trademark law permits a single color which has acquired secondary meaning to act as a mark).

26   Further, the Court rejects Plaintiff's argument that Defendant's use of the checkerboard pattern on its

27   entire shoe renders the mark merely decorative or ornamental.  The Ninth Circuit has explicitly held

28   the fact that the pattern is used all over a manufacturer's product does not conclusively establish that

it is simply background or decoration that would be unprotectable.  <u>See</u> <u>Vuitton Et Fils S.A. v. J.</u> <u>Young Enterprises, Inc.</u>, 644 F.2d 769, 775 (9th Cir. 1980) ("There is no limitation on the percentage of a product's surface area which may be covered by a trademark.").

Accordingly, the inquiry turns to the issue of whether Defendant has produced sufficient evidence to create an issue of triable fact as to whether the checkerboard pattern has acquired a secondary meaning as a source identifier for Defendant's shoes.

The Court concludes that Defendant has met its burden.  Defendant has come forward with some evidence that it has developed source identification properties in the checkerboard pattern.  This evidence came in the form of a survey in which 45% of respondents—male purchasers of casual and athletic shoes who had purchased such shoes in the past three months or were likely to purchase such shoes in the next three months—misidentified a competitor's slip-on shoe that copied the checkerboard pattern as a model coming from Defendant.  (<u>See</u> Def. Opp., Pappas Decl., Ex. 1). While Plaintiff objected to the relevancy of a study involving a shoe manufactured by a third party firm (not Plaintiff) to the issues in this case, the study is plainly relevant to the issue of whether consumers, in general, identify the checkerboard pattern with Defendant's product.  Thus while it is clear, as Plaintiff contends, that black and white checkerboard patterns are commonplace in the fashion industry, a fact issue remains as to whether the use of that pattern on casual and athletic shoes has developed a secondary meaning to buyers as a source identifier for Defendant.[1]

**B.      Functionality**

Plaintiff next argues that because exclusive use of the checkerboard pattern would put competitors at a significant non-reputation-related disadvantage, Defendant's alleged trademark is functional and thus ineligible to serve as a trademark.  Plaintiff notes that design patterns like a checkerboard are an integral and common part of casual shoes and without the full complement of common elements, the attractiveness of Plaintiff's line of shoes, and thus the ability to appeal to customers, will be diminished.  (<u>See</u> Def. Mem. ISO Mot., Magnusson Decl. ¶ ¶ 8, 9, Hackett Decl.,

---

[1]Because the Court concludes that Defendant has produced sufficient evidence to create a triable issue of fact on the issue of secondary meaning, it is unnecessary to consider Defendant's somewhat controversial claim that its registration for the so-called classic presentation of the checkerboard pattern on its "Classic Slip-On" creates a presumption that it has trademark rights in the checkerboard pattern alone.

1   10, 11.)[2]

2   Defendant argues that the checkerboard design is not essential to the performance of shoes,

3   and thus that it is not functional.  Defendant notes that it sells shoes without the checkerboard design

4   and all those shoes work identically, afford the same comfort, support, and durability.  Further,

5   Defendant asserts that it has  never advertised that the checkerboard design confers any utilitarian

6   advantage.

7   **i.     Analysis**

8   A product feature is functional and cannot serve as a trademark "if [the product feature] is

9   essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if

10  exclusive use of the feature would put competitors at a significant, non-reputation-related

11  disadvantage."  Qualitex, 514 U.S. at 164-165 (internal citation and quotation omitted).  The

12  functionality doctrine prevents trademark law, which seeks to promote competition by protecting a

13  firm's reputation, from inhibiting legitimate competition by allowing a producer to control a useful

14  product feature.  Id.  Under the functionality, doctrine, competitors can reasonably replicate important

15  non-reputation related product features.  Id. at 169.

16  While functionality is most often contemplated in "utilitarian" terms, such as comfort, support,

17  and durability, the Ninth Circuit has recognized that the functionality doctrine may be extended into

18  the protection of purely aesthetic properties.  This doctrine of so-called "aesthetic functionality" holds

19  that "when goods are bought largely for their aesthetic value, their features may be functional because

20  they definitely contribute to that value and thus aid the performance of an object for which the goods

21  are intended."  Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062 (9th Cir.

22  2006).

23  This circuit's seminal case on functionality in the context of aesthetics is Pagliero v. Wallace

24  China Co., 198 F.2d 339 (9th Cir. 1952).  In that case, the plaintiff, Wallace China Company

25

26  ─────────────

27  [2]Defendant challenges the expertise of Magnusson and Hackett, who both provided declarations in support of Plaintiff's motion.  A review of the supporting materials, however, reveals that these individuals have extensive exposure to skateboarding culture.  Because skateboarders are

28  a key target audience, their opinions on what features are important to that demographic are relevant and proper foundation exists for those opinions.

("Wallace"), had used decorative designs to beautify hotel china and sought to prohibit a competitor from using the decorative patterns and a corresponding list of names. Id. at 339. None of the patterns or names were covered by registered trademarks or patents; instead, Wallace claimed secondary meaning, that is, Wallace claimed customers associated the patterns with the company due to extensive advertising and a reputation for quality. Id. at 342. In concluding that the patterns were not eligible for protection, the Ninth Circuit observed that the designs were "functional" since the decorations "constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." Id. at 343-44. Accordingly, the court found that "granting relief [for trademark infringement]. . . would render Wallace immune from the most direct and effective competition with regard to these lines of china." Id. at 344.

The Supreme Court, while not explicitly invoking the doctrine of aesthetic functionality, discussed related principles in Qualitex Co. v. Jacobsons Prods. Co. In that case, the Court considered whether a color alone (a distinctive green-gold used on dry cleaning press pads) could be protected as a trademark. Observing that a color alone could indeed meet the basic legal requirement for a trademark, namely that it could act "as a symbol that distinguishes a firm's goods and identifies their source," the Court concluded that the use of color as a trademark is not per se barred by the functionality doctrine. Qualitex, 514 U.S. at 165-66. In that case, it was the green-gold color of dry cleaner pads which served a trademark (i.e., source-identifying) function. The Court noted that while the use of some color on the pads served a non-trademark function, namely to avoid noticeable stains, functionality did not defeat trademark protection for one firm's exclusive use of green-gold color because there was "no competitive need in the press pad industry for the green-gold color." Id. at 166. In other words, while the Court recognized that using *some* color served a significant non-competitive purpose, allowing one firm in a particular industry exclusive use of the green-gold color as a trademark and thus preventing other companies from using the color had no negative effects on competition. The Court noted, however, that in the case of color scarcity or color depletion problems which may occur in other contexts, "the trademark doctrine of 'functionality' normally would seem available to prevent anti-competitive consequences . . . ." Id. at 169.

The Ninth Circuit, recently synthesizing this case law, has described the functionality inquiry thusly:

> After <u>Qualitex</u> and <u>TrafFix</u>, the test for functionality proceeds in two steps. In the first step, courts inquire whether the alleged "significant non-trademark function" satisfies the <u>Inwood Laboratories</u> definition of functionality-"essential to the use or purpose of the article [or] affects [it's] cost or quality." [citations omitted]  If this is the case, the inquiry is over-the feature is functional and not protected.  [citation omitted].  <u>In the case of a claim of aesthetic functionality, an alternative test inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage.  [citation omitted]</u>

<u>Au-Tomotive Gold</u>, 457 F.3d at 1072.  Notably, while Defendant attempts to cast the doctrine of aesthetic functionality as having been "rejected" or "severely limited," it failed to discuss or attempt to discount this very recent case law in its moving papers.

Ultimately, while it is a close case, the Court concludes that a genuine issue of material fact exists as to whether protection of the checkerboard pattern as a trademark would impose a significant non-reputation related competitive disadvantage.  While Plaintiff has set forth evidence that the checkerboard pattern is widely used in fashion generally and hence desirable as an available shoe pattern, Plaintiff has not connected the protection of the checkerboard pattern with competitive consequences by, for example, introducing evidence that consumers have an affinity for the checkerboard pattern unrelated to Defendant's use of the pattern on its shoes.  Defendant's evidence that the checkerboard design on casual and sports shoes acts as a source identifier for Defendant, (<u>See</u> Def. Opp'n, Pappas Decl., Exhibit 1) and its related evidence of the significant recognition Defendant's brand name has received, (see Def. Opp'n, Bettencourt Decl., at 5; <u>id.</u>, Ex. A, at 9), when viewed in the light most favorable to Defendant, creates a genuine issue as to whether the alleged disadvantage to competition associated with protection of the checkerboard pattern would be related to Defendant's reputation.  In other words, Defendant's evidence supports a plausible case that the checkerboard pattern's appeal to consumers comes primarily from its association with Defendant's shoes and the reputation or prestige associated with owning one of Defendant's shoes.  At trial, Plaintiff is free to rebut this case with its own evidence that consumers who buy shoes adorned with a checkerboard pattern do so for reasons unrelated to a desire to own Defendant's product.  <u>See</u>

1  Brunswick Corp. v. British Seagull Ltd., 35 F.3d 1527 (Fed. Cir. 1994) (where evidence revealed that

2  people who bought outboard motors for boats preferred black because of its compatibility with a wide

3  variety of boat colors and its ability to reduce the perception of the size of the motors in proportion

4  to boats, boat manufacturer's had a competitive need to use black on outboard motors and thus the

5  color black was functional).  Preserving these issues for trial is consistent with the Ninth Circuit's

6  observation that the issue of functionality has been consistently treated as a question of fact.[3]  Vitton,

7  644 F.2d at 775.

8  **C.      Likelihood of Confusion**

9      Next, Plaintiff contends that summary judgment is proper because no issue of triable fact exists

10  as to whether a likelihood of confusion exists between Plaintiff's and Defendant's products.

11  Likelihood of confusion exists when "customers viewing the mark would probably assume that the

12  product or service it represents is associated with the source of a different product or service identified

13  by a similar mark."  Kendall-Jackson, 150 F.3d at 1048.  Eight factors are relevant in the analysis of

14  likelihood of confusion.  AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).  The eight

15  factors in Sleekcraft are as follows: (1) the strength of the mark; (2) the proximity of the goods; (3)

16  the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the type

17  of goods and the degree of care likely to be exercised by the purchaser; (7) the alleged infringer's

18  intent in selecting mark; and (8) the likelihood of expansion of the product lines.  The Court reviews

19  the parties arguments in turn.

20      **i.      Sleekcraft Factors**

21

22          (1)      Strength

23      Plaintiff says simple geometric shapes are given narrow protection, so the use of a repeating

24  shape in the case of Defendant's claim to the checkerboard pattern creates a weak mark as it is less

25  likely to be remembered in the mind of the consuming public.  Moreover, Plaintiff argues that because

26

27      [3]Once again, as in the Court's analysis of the distinctiveness issue, it is unnecessary to consider
Defendant's claim that its Slip-On Registration is conclusive evidence of a trademark right in the
checkerboard pattern itself and that, accordingly, the burden is on Plaintiff to prove functionality.

28  Whether the burden is on Defendant or Plaintiff to prove or disprove functionality, the summary
judgment evidence is sufficient to create a triable issue of material fact.

the pattern is used by numerous clothes and shoe designers, it is diluted.  Moose Creek Inc. v. Abercrombie & Fitch Co., 331 F.Supp.2d 1214, 1224 (C.D. Cal. 2004) (even arbitrary mark may be classified as weak where there has been extensive third party use of similar marks on similar goods).

Defendant asserts that because the products here are identical, i.e. sports and casual shoes, a less stringent test of similarity applies.  Guess?, Inc. v. Tres Hermanos, 993 F.Supp. 1277, 1283 (C.D. Cal. 1997).  Defendant points to it's success in selling the checkerboard pattern shoes, including the Classic Slip-On's placement on the list of best shoes of all time and the checkerboard pattern's appearance in movies and TV shows as evidence of how strong the mark has become over time.

### (2)     Proximity of Goods

Plaintiff concedes that the second factor favors Defendant since both parties market and sell shoes.

### (3)     Similarity

Plaintiff says that while Defendant uses the checkerboard pattern on the entire shoe, Plaintiff's shoe uses it only as a decorative accent, thus, given the size, shape, and placement of the checkerboard pattern, the shoes are completely different.  Another distinction urged by the Plaintiff is that both shoes have a source identifying tag with the name of the respective brands ("Vans" and "Vans Off the Wall" versus "Osiris" and "Osiris Shoes").

Defendant counters by noting that because the companies sell the same type of goods to the same market (skateboarders), there is a greater chance of confusion, noting that the Ninth Circuit has held that a diminished standard of similarity is applied when comparing marks of closely related goods."  See Guess?, 993 F.Supp. at 1280.

### (4)     Actual Confusion

Evidence of actual confusion is persuasive proof that future confusion is likely.  Kendall-Jackson, 150 F.3d at 1048.  In order to establish actual confusion, Defendant must show actual customers believed the checkerboard design was its trademark.  As evidence of this, Defendant cites the survey discussed above in which 49% of respondents identified a competitor's checkerboard shoe as manufactured by Defendant.

06cv2365

Plaintiff objects to the survey on the grounds of relevancy because the survey did not compare Plaintiff's product with its own Serve Black shoe, but instead with a third party firm's shoe which Plaintiff maintains is not similar to the Serve Black shoe.

(5)      <u>Similarity of Marketing Channels</u>

Plaintiff concedes that this factor favors Defendant.

(6)      <u>Degree of Care Likely Exercised by Purchaser</u>

Plaintiff says that because the shoes are expensive, ($40 to $90 for Vans) and ($55 for Serve Black), consumers will likely take more time to make their purchasing decisions and will exercise a much higher degree of care. Also, argues Plaintiff, these are professional and amateur skateboarders, the kind of sophisticated consumers who would know exactly what they are buying.

Defendant asserts that a reasonably prudent purchaser exercises a low degree of care in purchasing athletic shoes. In addition, Defendant argues that the issue of post-purchase confusion would still be a problem even if purchasers themselves would not likely be confused.

(7)      <u>Alleged Infringer's Intent in Selecting Mark</u>

Plaintiff asserts that it selected the mark in good faith. The popularity of checkerboard pattern (and thus Plaintiff's decision to use it) has nothing to do with Defendant but is simply an indication of fashion trends.

Defendant notes, however, that Jay Wilson, Plaintiff's Executive Vice President, was formerly a Vice President of Marketing and Global Marketing for Defendant. During his tenure, one of his primary responsibilities was promoting the checkerboard design. Defendant argues that the timing of his departure and the quick arrival of Plaintiff's infringing shoes is unusual enough to create a fact issue as to whether Plaintiff deliberately intended to confuse the public.

(8)      <u>Likelihood of Expansion</u>

Plaintiff concedes that this factor favors Defendant since the two companies are already manufacturing similar products.

**i.      Analysis**

Whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be "confused as to who makes what" product is the "core element" of trademark infringement law.  Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 901 (9th Cir. 2002).  A court "should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into to determining likelihood of confusion usually requires a full record."  Id. at 901-02.

Extended analysis on this issue is unnecessary.  Even discounting the survey data as irrelevant for purposes of determining likelihood of confusion between Plaintiff's and Defendant's products, Plaintiff's concession that many of the above factors favor Defendant suggests that a genuine issue of fact exists on the issue.  Further, viewing the evidence of Mr. Wilson's defection near the time that an allegedly infringing product was introduced in a light most favorable to Defendant, an inference arises that Plaintiff intentionally copied the Defendant's mark.  Such an inference alone is persuasive proof that future confusion is likely.  See Kendall-Jackson, 150 F.3d at 1048 (evidence that the defendant intentionally copied the plaintiff's mark is persuasive proof that future confusion is likely).  Accordingly, summary judgment on this issue is inappropriate.

**D.  Fair Use**

Finally, Plaintiff claims that even if Defendant can establish both trademark rights and likelihood of confusion, Plaintiff's use of the checkerboard pattern is a "fair use" under the Lanham Act because the checkerboard pattern is "generic" and "descriptive."  Essentially, Plaintiff argues that because it did not choose the pattern to deceive the public, its use is "fair use."

**i.      Analysis**

Fair use is a reasonable and good faith use of a descriptive term that is another's trademark to describe rather than to identify the user's goods, services or business."  This concept protects the right of society at large to use words or images in their primary descriptive sense, as against the claims of a trademark owner to exclusivity.  McCarthy § 11:45.  The Lanham Act applies this principle where "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of

1    . . . [a] party, or their geographic origin." 15 U.S.C. § 1115(b)(4).

2       Plaintiff cites no case for the proposition that fair use would apply in this context but simply

3 attempts to replay its arguments regarding the generic nature of the checkerboard symbol. Under the

4 circumstances, the Court concludes that the principle of fair use and its protection of images in their

5 primary descriptive sense has no relevance to the present controversy.

6 **CONCLUSION**

7

8       Based on the foregoing, the Court DENIES Plaintiff's motion for summary judgment.

9       **IT IS SO ORDERED**.

10 **DATED: November 6, 2007**

11

12                                 **IRMA E. GONZALEZ, Chief Judge**

13                                 **United States District Court**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

          06cv2365